IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBERT ZILLER,             )
       Plaintiff,        )
                     )
    vs.                )     Civil Action No. 05-82
                     )     Judge Gary L. Lancaster
EMERALD ART GLASS, BOB    )     Magistrate Judge Robert C. Mitchell
ZIELINSKI, CRAIG COZZA,     )
ALEX-FORBES AND MURRAY, L.P.,  )
and ALEX ENTERPRISES LLC,    )
        Defendants.     )

REPORT AND RECOMMENDATION

I.    <u>Recommendation</u>

It is respectfully recommended that the motion for summary judgment submitted on

behalf of the plaintiff (Docket No. 112) be denied.  It is further recommended that the motion for

summary judgment submitted on behalf of defendants Craig Cozza, Alex-Forbes and Murray,

L.P. and Alex Enterprises LLC (Docket No. 117) be granted with respect to Craig Cozza and

denied in all other respects.  It is further recommended that the motion for summary judgment

submitted on behalf of defendants Emerald Art Glass and Robert Zielinski (Docket No. 124) be

denied.

II.    <u>Report</u>

Plaintiff, Robert Ziller, brings this action under the Copyright Act, 17 U.S.C. §§ 101-

1001, alleging that the mural installed in the building known as either 1700 Murray Avenue or

5740 Forbes Avenue, Pittsburgh, PA 15217 ("the Building") infringes his federal copyright for

his drawing of a glass mural known as <u>Flow</u>.  Named as defendants are the following parties:

Emerald Art Glass ("EAG") (the business that was paid for designing, constructing and installing

the display), Robert Zielinski (owner of EAG), Alex-Forbes and Murray, L.P. (the limited

partnership that developed the Building but did not design, construct and/or install the display),

Alex Enterprises, LLC (the general partner of Alex-Forbes and Murray, L.P.) and Craig Cozza

(president of Alex Enterprises, LLC).

Defendant Zielinski has filed a counterclaim for copyright infringement against Ziller,

averring that he knowingly and willfully copied two of Zielinski's works, Stream of Color and

Neighborhood Flow, when he made Flow.  Zielinski alleges that Ziller acted for the specific

purpose of infringing his copyrights for furtherance of his business objective.

Presently before this Court for disposition are three cross-motions for summary judgment,

submitted by: 1) Plaintiff (as to Zielinski's counterclaim); 2) Defendants Alex-Forbes and

Murray, L.P., Craig Cozza, and Alex Enterprises, LLC ("AF&M/Cozza"); and 3) Defendants

EAG and Robert Zielinski ("EAG/Zielinski").  For the reasons that follow, all of the motions

should be denied, except for the argument made by AF&M/Cozza that Craig Cozza in his

individual capacity should be dismissed as a defendant from this case.

Facts

Plaintiff holds U.S. Copyright VA 1-280-020, issued on November 8, 2004, for a work

known as Flow.  (Docket No. 142 ¶¶ 1-2.)  On the certificate, he listed the year of creation as

2003.  (Docket No. 115 Ex. K.)

Zielinski holds U.S. Copyright VAu 674-089, issued on June 6, 2005, for a work known

as Neighborhood Flow.  The parties have stipulated that Zielinski created Neighborhood Flow on

or about November 15, 2003.  (Docket No. 141 ¶ 1.)  Neighborhood Flow is the mural installed

in the Building and which Plaintiff contends violates his copyright.

Zielinski also holds U.S. Copyright VA 1-312-749, issued on May 9, 2005, for a work known as Stream of Color.  (Docket No. 141 ¶ 16.)  See also Zielinski Dep. at 106 & Ex. 32.[1] The parties agree that the date of first publication of Stream of Color was January 1, 1995. (Docket No. 114 ¶ 1; Docket No. 138 ¶ 1.)

Plaintiff's expert, James Shipman, describes Flow as follows:

> Mr. Ziller's Flow glass mural was to be comprised of five panels having a total length of more than ninety (90) feet, each panel being about eighteen (18) feet long.  Flow has four (4) flowing and undulating colored lines that each traverses the five (5) panels comprising the mural.  The four lines are paired into two pairs, with the pairs of lines intersecting with each other at various points along the length of the mural.  Each line is a different color and the background of the mural is dark blue indigo....  Flow incorporates the technique of back painting spandrel glass and has mirrors incorporated into the mural behind the painted glass.

(Shipman Expert Op. & Report at 3-4.)[2]  Paul Burke, one of the experts retained by EAG/Zielinski, describes it as follows:

> The proposed Flow mural copyrighted by Ziller was defined as a five (5) paned mural having a total length of ninety one (91) feet and a height of seven (7) feet six (6) inches.  Each panel was to have a length of approximately eighteen (18) feet.  The rendering shows four (4) undulating lines of similar uniform thickness that traverse the five panels described above in a continuous fashion.  Of the four lines there are two red hues and two blue hues that intersect in one spot to become a third color yellow.  The rendering also shows the backdrop of the proposed mural as a deep indigo blue.  The rendering shows the lines intersecting, however, the intersections occur between the similarly hued colors across the panels with the single overlapping connection of the two hues at the center of the third panel.  It is also interesting to note that in the fourth panel the two red lines completely leave the frame, leaving only 2 lines in view for much of the panel. [A description attached to the drawing] defines the use of Spandrel™ glass painting as the technique that was to be used in the event of its selection and

---

[1]      Docket No. 136 Ex. D.  Unless otherwise noted, all excerpts from Zielinski's deposition are contained in the EAG/Zielinski Appendix to their motion, Docket No. 127 Ex. D.

[2]      Docket No. 130 Ex. H.

installation...

       Significant to the establishment of the position of Ziller is that he defines the intent of the lines in <u>Flow</u> as an "abstract rendering of DNA" which in my expert opinion maps to the specific color selection of the two strands colored hues of blue and the two strands colored hues of red.  It also adds to the significance of the intersection on the third pane indicated by the color change to yellow. Defining the strands as DNA, can be seen as a reinterpretation of the original commissioning request to simply reflect flow.

(Burke Expert Op. & Report at 4.)[3]

       Shipman describes <u>Neighborhood Flow</u> as follows:

       Defendants' installed mural is also a glass mural that is comprised of five (5) panels having a total length of more than ninety (90) feet, each panel being about eighteen (18) feet long.  The installed mural has four (4) flowing and undulating lines that horizontally traverse the five panels.  The four lines are paired into two pairs of lines that intersect with each other at various points along the length of the mural.  Each line is a different color and at night, there is a neon light that makes the background of the mural blue.

(Shipman Expert Op. & Report at 4.)  Burke describes it this way:

       The Installed Mural is a glass mural installed at the Forbes and Murray building, with the Forbes Avenue side of the Installed Mural having a similar dimension to the proposed <u>Flow</u> work described above.  This is no surprise as the commission for the Installed Mural was to fill the space available on the exterior of the first floor of the Building of which both artists had information.  The installed work has four (4) undulating lines of highly variable thickness that traverse the five (5) panels and all four lines intersect with a high frequency and no apparent subject driven focal point at the center of the Installed Mural.  While edges may be cropped, the body of each line stays in bounds.  The hues of each line are independent with no obvious visual tie linking any line to another.  Crossovers are at no point in the Installed Mural indicated with an alternate color.  The background color field on which the lines sit is white and, as noted in the Shipman opinion, in the evening, takes on a blue hue.  However, it is important to note that the blue is not indigo blue, or the color between blue and purple on the spectrum.  It would be better described as purple emanating from electric blue. Materials used in the installation of the Installed Mural are not Spandrel™ glass. They are a more traditional method of spray-coated glass using masking

---

[3]     Docket No. 127 Ex. G.

techniques to render the different color bands.

(Burke Expert Op. & Report at 4-5.)

<u>Background on the Building</u>

The Building's location at the axis of Squirrel Hill's two most popular shopping and entertainment streets attracted the community's interest and scrutiny during development. Early in development, Rite-Aid drug store secured the corner street-level space of the Building. Alex Enterprises, LLC and Rite-Aid hired Mark McCormick of McCormick Architects to design the Building. (Docket No. 121 ¶¶ 5-6; Docket No. 129 ¶¶ 5-6.) Construction of the Building began around September 1, 2003 and it was completed in approximately December 2004. (McCormick Dep. at 17,[4] 18.)

There are certain display specifications that Rite-Aid must follow to maintain consistency among Rite-Aid stores nationwide. One of these specifications is using the entire periphery of the store to display inventory. McCormick's proposed design for the Building included large windows stretching across much of this area. Early in development it became clear that the City of Pittsburgh Planning and Zoning Commission would require the windows to be treated in some manner to block the sight of Rite-Aid's inventory because of the store's prevalent location. (Cozza Dep. at 10-11[5]; Ziller Dep. at 112.[6])

---

[4]     Docket No. 123 Ex. D.  Unless otherwise noted, all excerpts from McCormick's deposition are contained in Plaintiff's Appendix of exhibits in support of his response to AF&M/Cozza's motion, Docket No. 130 Ex. F.

[5]     Docket No. 123 Ex. E.  Unless otherwise noted, all excerpts from Cozza's deposition are contained in the EAG/Zielinski Appendix to their motion, Docket No. 127 Ex. C.

[6]     Docket No. 123 Ex. A.  Unless otherwise noted, all excerpts from Ziller's deposition are
(continued...)

Ziller and McCormick Meet

On March 1, 2003, shortly after being hired to design the exterior of the Building, McCormick attended a friend's engagement party, where he was introduced to Plaintiff Robert Ziller.  (Docket No. 141 ¶ 8; Ziller Dep. at 20; McCormick Dep. at 7.)  Upon being told that Ziller was an artist, McCormick mentioned his involvement with the development of the Building, and remarked that the project would likely be in need of an artist to put up a mural in the windows on the exterior of the Building.  Ziller indicated that he would be interested and McCormick suggested that Ziller give him a call.  (Ziller Dep. at 20-22;[7] McCormick Dep. at 7-8.)  Ziller did not present any sketches to McCormick on March 1, 2003.  (Docket No. 141 ¶ 9.)

The parties vigorously dispute the scope of McCormick's employment.  Defendants contend that McCormick was hired strictly for the purpose of providing architectural designs and never had any authority to provide or coordinate any kind of display or mural.  (McCormick Dep. at 27, 68-69 & Ex. 2.)[8]  They note that McCormick Architects was hired pursuant to a written contract, and nothing in the contract mentions anything related to the design of a mural.  (McCormick Dep. at 23.)[9]  They further note that McCormick indicated that he explained to Ziller that hiring an artist was not within the scope of his involvement with the Building, and that Craig Cozza was in charge of executive decisions such as which artist to hire.  (Ziller Dep. at

---

[6](...continued)
contained in Plaintiff's Appendix of exhibits in support of his response to AF&M/Cozza's motion, Docket No. 130 Ex. A.

[7]        Docket No. 123 Ex. A.

[8]        Docket No. 127 Ex. A.

[9]        Docket No. 123 Ex. D.

29.)[10]  McCormick further explained that any work at this point would be on a "purely speculative basis."  (McCormick Dep. at 25, 54.)[11]

Plaintiff responds that McCormick testified that it was his understanding that McCormick Associates would be involved in the design of the mural.  (McCormick Dep. at 11, 13-15, 22-23, 25, 36, 50, 55-57, 74-78, 100, 103-04.)  McCormick also testified that he had a conversation with Cozza immediately after being introduced to Ziller, to tell him that he had met an artist who was interested in doing a mural and that Cozza "instructed us to by all means meet with Mr. Ziller." (McCormick Dep. at 25.)

Regardless of the actual and perceived scope of McCormick's authority, the record is undisputed that he discussed with Ziller the possibility of him creating a mural for installation in the Building.  Plaintiff states that, after meeting McCormick, he independently and without any input from anyone else created preliminary sketches of a mural having flowing lines.  (Ziller Dep. at 22, 25-26, 194-95;[12] Ziller Aff. ¶ 4.[13])  On March 2, 2003, Ziller e-mailed McCormick to tell him that he had made some preliminary sketches and to request specifics for the windows of the Building.  (Docket No. 141 ¶¶ 10-11; see also Ziller Dep. at 194;[14] McCormick Dep. at 9-11 & Ex. 1.)

Plaintiff states:

---

[10]     Docket No. 123 Ex. A.

[11]     Docket No. 123 Ex. D.

[12]     Docket No. 133 Ex. C.

[13]     Docket No. 130 Ex. I.

[14]     Docket No. 133 Ex. C.

That neither Mr. McCormick, Mr. Cozza, nor Mr. Zielinski provided me with the concept or the name of the proposed mural.

That I independently created the design for the proposed mural, which I entitled Flow, on March 2, 2003.

(Ziller Aff. ¶¶ 5-6.)

Ziller next corresponded with McCormick on March 5, 2003 via e-mail to schedule an appointment for March 7, 2003 at McCormick's offices.  The e-mail did not mention the existence of the sketch entitled Flow.  (Docket No. 141 ¶¶ 12-13.)

On March 7, 2003, Ziller met with McCormick at McCormick's office to pick up a copy of blueprints for the Building.  (Docket No. 141 ¶ 14; Ziller Dep. at 19-22,[15] 194.[16])  During this meeting, McCormick discussed some of the design ideas that were under consideration by the development team, including the stated intent to somehow incorporate human figures into the glass design.  (Ziller Dep. at 21-22 & Ex. 2 at RZ 0004;[17] McCormick Dep. at 8-10.)

Ziller and Zielinski Meet

On that same day (March 7), in response to McCormick's recommendation, Ziller visited EAG to schedule an appointment with Robert Zielinski.  (Ziller Dep. at 32.)[18]  The parties agree that Ziller and Zielinski met for the first time at the EAG showroom on March 13, 2003

---

[15]     Docket No. 123 Ex. A.

[16]     Docket No. 133 Ex. C.

[17]     Docket No. 115 Ex. C.

[18]     Docket No. 123 Ex. A.

(Zielinski Aff. ¶ 4),[19] but they disagree as to the substance of the meeting.  Zielinski states that:

> During the course of the March 13, 2003 meeting, Mr. Ziller solicited me for my ideas and concepts for a mural to be installed at the ... Building, at which time, I, among other things showed Mr. Ziller examples of the use of ribbons of color/a pseudo DNA molecule effect, both by means of (1) exhibiting to Mr. Ziller color photographs of works previously created by me and/or [EAG] as contained within a portfolio maintained at [EAG's] offices in a three ring binder, which included a color photograph of Stream of Color and a color photograph of an art glass project designed for the Wheeling, West Virginia Courthouse, entitled "River of Light," which incorporated flowing bands of colored glass; and (2) exhibiting to Mr. Ziller actual physical examples of the proposed undulating, intersecting multi-colored ribbon effect in at least two window panels hanging on display in [EAG's] showroom.
>
> At no time during the March 13, 2003 meeting did Mr. Ziller mention or state that he had any pre-conceived ideas as to a design for any proposed mural to be installed at the Building.  Likewise, Mr. Ziller did not show me any proposed drawings or sketches as to any such ideas.  Mr. Ziller did not show or provide to me the alleged drawing of "Flow" ... at the March 13, 2003 meeting.

(Zielinski Aff. ¶¶ 5-6.)  He also states that Ziller looked around the showroom and at one of his books of samples of prior art work.  (Zielinski Dep. at 83-87.)

Plaintiff denies these statements, contending that the purpose of the meeting was to look at materials for the construction of the mural that he (Ziller) would design.  (Ziller Dep. at 33-34; McCormick Dep. at 10.)  He also denies seeing designs on display in the EAG showroom and denies seeing any portfolios of samples when he visited it.  (Ziller Dep. at 215, 217.)[20]

Plaintiff states that Zielinski gave him an estimate of $20 per square foot for constructing and installing Flow.  (Ziller Dep. at 35.)  Zielinski denies giving him any estimates.  (Zielinski Aff. ¶ 10.)

---

[19]     Docket No. 127 Ex. F.

[20]     Docket No. 133 Ex. C.

March 17, 2003 Meeting: First Publication of Flow

On March 17, 2003, Ziller met with McCormick and gave him a copy of his sketch of Flow. (McCormick Dep. at 9-14; Ziller Aff. ¶ 7; Ziller Dep. at 69; see also Ziller Dep. at 25.[21]) The parties have stipulated that this represented Plaintiff's first publication of Flow. (Docket No. 141 ¶¶ 2, 6.) Plaintiff contends that McCormick presented this copy of the sketch to Craig Cozza, the developer of the Building. (Docket No. 129 ¶ 16.) Cozza has no recollection of it. (Cozza Dep. at 26.) McCormick's actual testimony is that he showed the sketch to Cozza, who "wasn't wild about it, but I remember him indicating that he liked the idea of it representing the flow." (McCormick Dep. at 15; see also id. at 47.) McCormick did not recall if he left the sketch with Cozza or kept it. (McCormick Dep. at 68-69.)[22]

Other Meetings?

Ziller asserts that he met with Zielinski again on March 24, 2003 and that it was at this meeting that he first showed Zielinski a copy of his Flow sketch. (Ziller Aff. ¶ 8; Ziller Dep. at 34-35.) He also states that he showed Zielinski a copy again in July 2003 and that he gave him a copy on November 7, 2003, when he met with Zielinski to ask for his help in completing the Sprout Fund application (discussed below). (Ziller Aff. ¶¶ 9, 11; Ziller Dep. at 54, 56-57.)

Zielinski denies that these meetings took place and he denies ever receiving a copy of Ziller's Flow sketch. (Zielinski Aff. ¶ 7.) Zielinski further states that, prior to January 28, 2005 (when he received a copy of the complaint from Plaintiff's counsel), he never saw a copy of Flow. Zielinski also denies having any communications with Cozza or McCormick about Flow,

---

[21]     Docket No. 133 Ex. C.

[22]     Docket No. 127 Ex. A.

including, without limitation, its existence and/or any alleged rights asserted by Plaintiff with respect thereto.  Aaron Kent, the former EAG employee who was responsible for inputting the design for the Installed Mural into the computer before it was manufactured, has also stated that he never saw a copy of <u>Flow</u>.  (Zielinski Aff. ¶¶ 8-9, 12; Zielinski Dep. at 75-76; Cozza Dep. at 51; Kent Dep. at 33-34.[23])  According to Zielinski, he had only one other meeting with Ziller, in February 2004, at which <u>Flow</u> was not discussed.  (Zielinski Aff. ¶ 12; Zielinski Dep. at 67.[24]) He denies ever discussing the Sprout Fund application with Ziller.  (Zielinski Aff. ¶ 11.)

The parties have stipulated that Cozza had no meetings with EAG and/or Zielinski at which Ziller was present, that Ziller makes no reference throughout his testimony to any joint meetings involving EAG, Zielinski and Cozza at which he (Ziller) was present, that Kent had no dealings with Ziller, no meetings with Ziller and no telephone conversations with Ziller with regard to anything including <u>Flow</u> and/or <u>Neighborhood Flow</u>, that Zielinski was the sole source of information provided to Kent for the design of <u>Neighborhood Flow</u> and ultimately the specification of materials and colors used to fabricate and manufacture <u>Neighborhood Flow</u> and that Kent did not have direct contact with Cozza or anyone other than Zielinski during the project.  (Docket No. 142 ¶¶ 5-8.)

Between September 2003 and March 2004, Ziller periodically contacted McCormick to inquire into the status of the Building and the display.  During this period, McCormick was not sure whether McCormick Architects would be involved with the mural portion of the project, as

---

[23]    Unless otherwise noted, all excerpts from Kent's deposition are contained in the AF&M/Cozza Appendix to their motion, Docket No. 123 Ex. C.

[24]    Docket No. 130 Ex. E.

Cozza had previously communicated his intention to use EAG, at least to implement the mural. (McCormick Dep. at 10, 16-17.)[25]

Ziller Meets Cozza, Begins Soliciting Contributions

On November 1, 2003, Ziller met Cozza for the first time.  (Ziller Dep. at 51-53; Cozza Dep. at 30.[26])  Plaintiff asserts that he gave Cozza a copy of his Flow sketch at this meeting. (Ziller Aff. ¶ 10.)  Cozza has not denied this allegation.  Plaintiff notes that, during the course of discovery in this case, Cozza's counsel sent his counsel a letter stating "Enclosed please find a copy of an original depiction given by your client to my client."  (Docket No. 130 Ex. K.)  Thus, the record is undisputed that Cozza was given a copy of Flow by Ziller at some point in time.

Defendants assert that Cozza told Ziller at this meeting that he was using EAG for the mural.  (Docket No. 121 ¶ 18.)  Plaintiff responds that Cozza said "perhaps he'll have [EAG] do something." (Ziller Dep. at 218.)  Plaintiff contends that he was never told that EAG would do more than implement the design and he points to McCormick's testimony that he thought his firm would also be involved in designing the mural.

Plaintiff states that, at this meeting, Cozza told him that he was interested in getting funding for the mural and Ziller responded that he would apply to the Sprout Fund for a Seed Award grant.  (Ziller Dep. at 51-53.)  Cozza provided him with information to put on the application and advice, such as asking for $60,000 even though the grant was for only $10,000. (Ziller Dep. at 85-91 & Ex. 8 at RZ 0016-0021.)  The Sprout Fund received this request on November 13, 2003 and on December 5, 2003, it notified Ziller that his application had been

---

[25]     Docket No. 123 Ex. D.

[26]     Docket No. 130 Ex. G.

denied.  (Ziller Dep. at 90 & Ex. 8 at RZ 0022-0023.)

Plaintiff also states that, in November 2003, Cozza gave him permission to have a plaque put on the Building to acknowledge the donations made to support the mural.  (Ziller Dep. at 68.) Finally, Plaintiff notes that, in January or February 2004, he sent out a letter, under the letterhead of Sun Crumbs (a non-profit organization) to solicit funds for the mural.  He included a copy of the Flow sketch with the letter, which he sent to over 300 people, as well as to members of City Council and other members of the City government such as the Public Art Commissioner.  He also personally provided a color copy of Flow to Tom Murphy, then Mayor of the City of Pittsburgh, on February 10, 2004.  (Ziller Aff. ¶¶ 12-14; Ziller Dep. at 26-27, 117 & Ex. 3;[27] Am. Compl. ¶ 23 & Ex. C.[28])

Defendants assert that Ziller never submitted a proposal requesting to be officially retained to do the project.  (Ziller Dep. at 41.)[29]  Plaintiff admits that he never received any kind of confirmation from Cozza that he wished to employ him.  (Ziller Dep. at 44.)  However, he points to the facts that: 1) McCormick, to whom Ziller had given a copy of the Flow sketch, showed it to Cozza in March 2003; 2) Cozza never requested a proposal; 3) he encouraged Ziller to seek funding for the mural from outside sources; 4) he gave Ziller permission to put up a plaque acknowledging donations; and 5) he provided information that Ziller used in preparing his Sprout Fund application.  (McCormick Dep. at 14-15, 47, 55-57, 65; Ziller Dep. at 44, 52-54, 66, 68-69, 84-93, 105, 109, 218.)  In addition, he notes that his claim is not that Defendants breached

---

[27]     Docket No. 133 Ex. C.

[28]     Docket No. 130 Ex. C.

[29]     Docket No. 123 Ex. A.

his contract to design a mural for the Building but that the Installed Mural infringes on his copyright.

Zielinski's Creation of Neighborhood Flow

Zielinski states that he and EAG were hired early on by Cozza to design, develop, fabricate, manufacture and install a glass mural in the Building, which met the requirements of the developer (Cozza), the Building itself (i.e. physical dimension and shape constraints of the window openings), and any requirements imposed by the community in which the Building was located or by the City of Pittsburgh Planning Commission.  (Zielinski Dep. at 23-38, 41-44, 103 & Ex. 19; Cozza Dep. at 14, 36.)  Plaintiff notes that Zielinski has not pointed to the existence of any written contract by which Cozza employed Zielinski or EAG.

Zielinski states that:

> The Neighborhood Flow mural design was a concept that existed in or around January/February 2003 in a rudimentary sketch form and was initially discussed with Craig Cozza in his capacity as an agent/representative of Alex-Forbes and Murray, LP and/or Alex Development, who originally rejected it.  Subsequently, however, the Neighborhood Flow design concept was resurrected, was modified, and evolved, (with changes in the design/look of the ribbons of color, the nature of the materials to be used, the colors to be used in the ribbons, and neon back lighting), in response to Craig Cozza's input and the input of the City of Pittsburgh Planning Commission, until some time in or around late July 2004/early August 2004 at which time the final design and color selections for use in the Neighborhood Flow mural were approved and [EAG] was authorized to proceed with the fabrication, manufacture and installation of the Neighborhood Flow Mural at the Building.

(Zielinski Aff. ¶ 13.)  See Zielinski Dep. at 21, 30, 87-89.  See also Zielinski Dep. at 104.[30]

At his deposition, Zielinski stated that he initially drew the concept of flowing lines on a napkin while he was at lunch with his wife sometime in January or February, 2003.  (Zielinski

---

[30]      Docket No. 130 Ex. E.

Dep. at 18, 73-74, 95, 102 & Ex. 25.)  After lunch, Zielinski returned to his office where he re-sketched out what he had drawn on the napkin and elaborated it a bit more in front of Aaron Kent, who was then the EAG employee who was responsible for operating the Flexi-Sign Pro Software.  (Zielinski Dep. at 18, 71-74.)  Kent testified that he witnessed Zielinski draw the sketch of the design with a pencil.  (Kent Dep. at 23-24.)  Zielinski provided all of the input for the design and the colors used in the final Installed Mural.  (Kent Dep. at 26, 34-35.)  Zielinski states that he was entirely responsible for coming up with the design and concept for the final Installed Mural.  (Zielinski Dep. at 95.)

Plaintiff responds that Kent never said that he saw Zielinski independently create the mural, that Zielinski has not proffered a napkin with flowing lines on it, and that Zielinski himself testified that Cozza and the Department of City Planning gave a lot of input regarding what they wanted to see on the mural.  (Zielinski Dep. at 19, 104-05.)  In addition, Plaintiff notes that Kent testified that the sketches marked Exhibits 23 and 24 to his deposition (corresponding to Zielinski Deposition Exhibits 25 and 26) were given to him after the "hiatus" (during which time he entered no designs into the computer with respect to this project), which Kent said occurred between May 2003 and February 2004.  (Kent Dep. at 14, 22-29, 36 & Exs. 18-24.)[31] Thus, the record is in dispute as to when Zielinski drew the sketches.  Plaintiff admits that Zielinski was the sole source of information provided to Kent for the design of Neighborhood Flow.  (Zielinski Dep. at 95; Kent Dep. at 9, 26, 34-35; Docket No. 132 ¶ 23.)

Zielinski states that neither Cozza nor anyone else provided him with design/concept suggestions or sketches, other than Cozza's initial suggestion that the design must be a

---

[31]    Docket No. 133 Ex. F.

continuous/flow from one panel of the glass façade of the Building to the next.  (Zielinski Dep. at 21, 94, 104.)  Plaintiff responds that Cozza did not initially suggest that the design should be a continuous "flow," citing McCormick's testimony that Cozza never used the word "flow" and that the idea of flow was introduced when he saw Ziller's sketch.  (McCormick Dep. at 47, 59.)[32] He further notes that Zielinski also testified that "I came up with the idea of having a flow to the things."  (Zielinski Dep. at 84.)

Zielinski states that, from initial conceptualization to fabrication, Neighborhood Flow followed an evolutionary process, with changes in the design/look of the ribbons of color, the nature of the materials to be used, the colors to be used in the ribbons, and neon back lighting, in response to Cozza's input and the input of the City of Pittsburgh Planning Commission. (Zielinski Dep. at 23-38, 41-44, 53-54, 65, 73-74, 104 & Exs. 19, 25, 26; Kent Dep. at 9-11, 18-29 & Exs. 21-26;[33] Cozza Dep. at 14, 16-17, 24, 28-29, 39-40, 45-48.)

Zielinski states that, on or around June 21, 2004 the City of Pittsburgh Planning Commission, after viewing a mock-up of the final proposed design, approved the Neighborhood Flow design, which, with a few minor revisions, was approved by Cozza for fabrication on or around August 10, 2004.  Cozza issued a check to EAG in the amount of $29,000.  (Zielinski Dep. at 41-42, 48, 53-54; Cozza Dep. at 29, 43-44 & Ex. 22.)  See also McCormick Dep at 18. The parties have stipulated that the installation of Neighborhood Flow was completed in late August/early September 2004.  (Docket No. 142 ¶ 3.)

Zielinski, who has been in the art glass design and manufacturing business for a period of

---

[32]     Docket No. 133 Ex. B.

[33]     Docket No. 127 Ex. E.

23 years (Docket No. 142 ¶ 9; Docket No. 140 ¶ 1; Zielinski Dep. at 6), has created similar works in the past (pre-2003) using the concept of intertwining ribbons of different colors which undulate over the length of the design (Docket No. 142 ¶ 10), some of which designs are on display as removable transom window panels or as free standing display pieces in the EAG showroom and others which can be viewed as photographs in a project portfolio on display and accessible to the public at EAG's showroom.  (Zielinski Dep. at 85-87, 105-06; Cozza Dep. at 14, 16-17; Zielinski Aff. ¶ 5.)  Thus, Zielinski contends that on March 13, 2003, Ziller used the opportunity of visiting the EAG showroom to look at prior work Zielinski had done and infringed his copyrights by creating the <u>Flow</u> design thereafter.

Plaintiff notes that none of the designs suggested by Zielinski were approved by Cozza until after he (Ziller) sent out the Sun Crumbs letter with the enclosed copy of <u>Flow</u> in January/February 2004.  (Zielinski Dep. at 24-51 & Exs. 3-21;[34] Kent Dep. at 7-27 & Exs. 2-21;[35] Ziller Aff. ¶¶ 12-15.)  He further argues that Zielinski did not provide Kent with a preliminary sketch of the Installed Mural until sometime after February 2004.  (Kent Dep. at 35-36.)

Procedural History

Plaintiff filed this action on January 25, 2005 and on June 8, 2005, he filed an amended complaint (Docket No. 21).  He alleges that Defendants have infringed his copyright and he seeks an injunction restraining them from further engaging in violation of the copyright laws, as well as damages, including attorney's fees.

On June 28, 2005, EAG/Zielinski filed an answer and counterclaim (Docket No. 23).

---

[34]     Docket No. 130 Ex. E.

[35]     Docket No. 133 Ex. F.

They allege that Ziller has infringed Zielinski's copyrights in his original works <u>Stream of Color</u> and <u>Neighborhood Flow</u>.

On October 11, 2006, Plaintiff filed a motion for summary judgment as to Zielinski's counterclaim (Docket No. 112).  On November 7, 2006, motions for summary judgment were filed by AF&M/Cozza (Docket No. 117) and by EAG/Zielinski (Docket No. 124).[36]

<u>Standard of Review</u>

Summary judgment is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'  <u>Woodside v. School Dist. of Philadelphia Bd. of Educ.</u>, 248 F.3d 129, 130 (3d Cir. 2001) (quoting <u>Foehl v. United States</u>, 238 F.3d 474, 477 (3d Cir. 2001) (citations omitted)). In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor.  <u>Doe v. County of Centre, PA</u>, 242 F.3d 437, 446 (3d Cir. 2001); <u>Woodside</u>, 248 F.3d at 130; <u>Heller v. Shaw Indus., Inc.</u>, 167 F.3d 146, 151 (3d Cir. 1999).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing'–that is, pointing out to the District Court–that there is an absence of evidence to support the non-moving party's case."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply

---

[36]     These same motions had been previously filed by the parties in May 2006 (Docket Nos. 47, 50, 52.)  On October 4, 2006, an order was entered (Docket No. 111) dismissing the earlier motions for failure to comply with Local Rule 56.1 and other procedural irregularities.

show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co.

v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Copyright Infringement

To prevail on a claim of copyright infringement, a plaintiff must establish: 1) ownership

of a valid copyright; and 2) that the defendant copied original or "protectible" aspects of the

copyrighted work. Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 348, 361 (1991);

Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc., 307 F.3d 197, 206 (3d Cir.

2002). In the absence of direct evidence of copying, the second element may be proved

inferentially "by showing that the defendant had access to the copyrighted work and that the

original and allegedly infringing works share substantial similarities." Kay Berry, Inc. v. Taylor

Gifts, Inc., 421 F.3d 199, 207-08 (3d Cir. 2005) (citations omitted).

The Court of Appeals has further noted that:

"Substantial similarity," in turn, is further broken down into two
considerations: (1) whether the defendant copied from the plaintiff's work and (2)
whether the copying, if proven, went so far as to constitute an improper
appropriation. First, the fact-finder must decide whether there is sufficient
similarity between the two works in question to conclude that the alleged infringer
used the copyrighted work in making his own. A showing of substantial
similarity in this sense, coupled with evidence that the infringing author had
access to the original work, permits a fact-finder to infer that the infringing work
is not itself original, but rather is based on the original. At this stage of the
inquiry, expert testimony is permissible to help reveal the similarities that a lay
person might not ordinarily perceive....

"Not all copying, however, is copyright infringement." Even if actual
copying is proven, the fact-finder must decide without the aid of expert testimony,
but with the perspective of the "lay observer," whether the copying was "illicit,"
or "an unlawful appropriation" of the copyrighted work." The focus in this
second step is whether the substantial similarities relate to protectible material.
Phrased in an alternative fashion, it must be shown that copying went so far as to
constitute improper appropriation, the test being the response of the ordinary lay
person. Part of this inquiry involves distinguishing between the author's

expression and the idea or theme that he or she seeks to convey or explore.

It is a fundamental premise of copyright law that an author can protect only the expression of an idea, but not the idea itself.  See 17 U.S.C. § 102(b). Thus, an author may base his work on the same inspiration as that of an earlier work, but he may not "copy the copy."  When determining whether two works are substantially similar, a fact-finder must determine whether the later work is similar because it appropriates the unique expressions of the original author, or merely because it contains elements that would be expected when two works express the same idea or explore the same theme.

Nearly every work involves a blend of idea and expression.  Because an author can only demonstrate substantial similarity by referencing those aspects of his work that embody his creative contribution, he will have a more difficult time proving infringement if his work contains only a minimal amount of original expression....  The First Circuit has endorsed this view, explaining that when there is only a limited number of ways to express an idea "the burden of proof is heavy on the plaintiff who may have to show 'near identity' between the works at issue." Concrete Mach. Co. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 606-07 (1st Cir. 1988).

Id. at 208-09 (quoting Feist Publ'ns, 499 U.S. at 361) (other citations omitted).

The court also noted that:

In some instances, there may come a point when an author's expression becomes indistinguishable from the idea he seeks to convey, such that the two merge.  In these circumstances, no protection is available for the expression; otherwise, the copyright owner could effectively acquire a monopoly on the underlying art or the idea itself.  Merger is rare, however, and is generally found in works with a utilitarian function.

Id. at 209 (citations omitted).  The Court of Appeals has never found an instance in which a

completely aesthetic expression merged into an idea.

Plaintiff's Motion as to Zielinski's Counterclaim

Plaintiff argues that: 1) the dates of creation and first publication for Flow predate the

date of first publication of Neighborhood Flow and therefore he could not have copied elements

of Zielinski's work when he created Flow because he could not have had access to it; and 2)

Zielinski has failed to proffer any evidence that he copied any elements of <u>Stream of Color</u> when he created <u>Flow</u>.

Zielinski responds that: 1) <u>Stream of Color</u> was first created and published in 1995, a photograph of it was incorporated into a binder that was displayed on the conference table in EAG's showroom beginning no later than January 2003 and the earliest date Ziller alleges he had the <u>Flow</u> sketch to show to Mark McCormick was March 17, 2003, four days after he met with Zielinski at the EAG showroom where he had a reasonable opportunity to view and copy <u>Stream of Color</u>;[37] and 2) there are genuine issues of material fact as to whether there is substantial similarity between <u>Stream of Color</u> and <u>Flow</u>.

<u>Access</u>

The parties argue with respect to each other's motions that the element of access presents a genuine issue of material fact.  The record supports this conclusion.  Zielinski contends that Ziller saw his prior work (<u>Stream of Color</u>) at the EAG showroom on March 13, 2003 and on several other occasions when he made unscheduled visits and met with no one.  Ziller denies seeing Zielinski's prior work.  The Court cannot make a credibility determination as to this issue and it must be decided by the trier of fact.  For this reason alone, Plaintiff's motion for summary judgment as to Zielinski's counterclaim should be denied.  In addition, as discussed below, there are genuine issues of material fact with respect to the question of whether Ziller's work is "substantially similar" to Zielinski's.

---

[37]     Zielinski does not argue that Ziller had access to <u>Neighborhood Flow</u> when he created <u>Flow</u>.

Defendants' Motions for Summary Judgment

AF&M/Cozza argue that: 1) Plaintiff cannot maintain an action against Cozza in his individual capacity because at all times he acted as employee of Alex Enterprises, LLC; and 2) Plaintiff cannot demonstrate substantial similarity of the protectible "expression," an essential element of his claim, and he cannot rely on the expert report of James Shipman because Shipman was familiar with and involved with Ziller's work prior to this case, because he describes the "overall visual impressions" created by the two works (overstepping his role) and because his comparisons are inconsistent and insignificant.

Plaintiff responds that: 1) Cozza himself did not know in what capacity he was working or for whom he was working and there is no corporate registration for "Alex Development," a name Cozza used and therefore Ziller's reliance on that name was reliance on Cozza personally; and 2) expert testimony is appropriate to establish whether there is sufficient similarity between the works so as to conclude that the alleged infringer copied the work and Shipman has done so, Shipman's prior knowledge of Ziller's design does not prevent him from testifying as an expert, and there are genuine issues of material fact as to whether McCormick represented that his firm was to be involved in the design of the mural to be installed in the Building.

EAG/Zielinski argue that: 1) Plaintiff cannot demonstrate a "striking similarity" between his work and Neighborhood Flow based on Shipman's expert report (incorporating the argument made by AF&M/Cozza) in order to demonstrate indirectly that they copied his work; and 2) he cannot demonstrate a substantial similarity between the expression of his idea in Flow and Neighborhood Flow.

Plaintiff responds that: 1) he has appropriately relied on Shipman's expert opinion to

demonstrate probative similarity between Flow and the Installed Mural; and 2) there are genuine

issues of material fact concerning the elements of access and substantial similarity.

Access

As noted above, the issue of access is disputed.  Ziller contends that he showed Zielinski

his Flow sketch in March, July and November 2003, but Zielinski denies it.  The record is

undisputed that Cozza received a copy of Flow at some point from Ziller, but Zielinski denies

receiving a copy from Cozza, McCormick or anyone else.  Moreover, Zielinski has offered

testimony that, prior to 2003, he independently created other works of art (such as Stream of

Color) using the same theme of undulating ribbons of color.  On the other hand, Zielinski's own

testimony about when he created Neighborhood Flow (January/February 2003) is disputed by the

testimony of his former employee, Aaron Kent (who says it occurred after the hiatus, that is, in

February 2004 or sometime thereafter).  In addition, Zielinski has stipulated that he created

Neighborhood Flow on or about November 15, 2003.  (Docket No. 141 ¶ 1.)

Substantial Similarity

Defendants argue that, despite the Plaintiff's allegations of copying, there are significant

differences between his Flow sketch and the mural designed, constructed, and installed by

Defendant EAG.  Plaintiff argues that while there are trivial differences between Flow and

Neighborhood Flow, they are substantially similar.

Defendants cite Designer's View, Inc. v. Publix Super Markets, Inc., 764 F. Supp. 1473

(S.D. Fla. 1991), aff'd mem., 961 F.2d 223 (11th Cir. 1992), to support their argument that the

protectible elements of Plaintiff's copyright are not substantially similar to the alleged infringing

work.  In that case, Designer's View, which was engaged in the business of designing and

23

manufacturing simulated stained glass panels made by painting acrylic designs on translucent

plastic, brought suit against Publix Super Markets and Darren Williams Systems ("DWS"),

contending that the decorative displays being produced by DWS for Publix stores infringed its

copyright, which it had obtained on two such panels (one for the produce section displaying two

cornucopia with fruits and vegetables flowing across the panels, and the other for the bakery

section displaying bakery products and a breadbasket containing several baking ingredients).

The court noted that "while Designer's View may copyright the artist's unique manner of

expressing the various fruits, vegetables and baked products, it may not copyright the idea that

fruits, vegetables and baked goods are displayed on simulated stain glass." Id. at 1478.  In

contrasting the works, the court found that:

> Although the subject matter of the Designer['s] View panels and that of the DWS
> panels are essentially similar and the medium of expression for both is a
> simulation of stained glass on backlit acrylic panels, these aspects of the artistic
> work are not among those protected by the Copyright Act.  However, that aspect
> of the artist's work which is protected, the manner in which he creates the fruits,
> vegetables and baked goods on the acrylic panels, is not substantially similar.

Id. at 1479.  Specifically, the court observed that: 1) the works had different color backgrounds

(blue and white versus green and white); 2) the Designer's View panels depicted a more realistic

approach to the subject matter, while the DWS panels were more stylized; 3) the Designer's

View panels employed the "crazing" technique not used in the DWS panels, allowing more light

to come through the background;  4) in the produce panels, the predominant figure of a

cornucopia and the technique of mirror imaging displayed in the Designer's View panels were

entirely absent from the DWS panels; 5) all of the fruit and vegetable elements in the produce

panels were moved around in, removed from or in some other way altered in the DWS panels

and the DWS panels contained additional items not displayed in the Designer's View panels; 6)

24

the basket in the bakery panels used a different weave, shape and type of material than the basket in the DWS panels; 7) the bakery ingredients were different in kind and were moved outside the basket in the DWS panels, and even the milk bottle, the only ingredient common to both baskets, was different in shape; 8) the dish containing eggs had a different appearance and color in the Designer's View panel than it did in the DWS panel and one set of panels placed some of the eggs outside the dish while the other did not; and 9) the Designer's View panels contained a wide variety of items not present in the DWS panels and vice versa.  Id.

Similarly, Defendants argue, the concept of wavy lines going across a mural is not a protectible aspect under Ziller's copyright for Flow.  Furthermore, they contend that the aspect of Ziller's copyright that is protected, the manner in which the wavy lines are displayed, is not substantially similar to the lines in Neighborhood Flow based on numerous distinctions between the two works.

Zielinski describes the differences between the two works as follows:

(a) the number, shape, size (length and thickness), form and pattern, and placement of each colored glass ribbon incorporated into each respective design are not similar; to wit: (1) In Ziller's Flow sketch, each of the colored ribbons appears to maintain a fairly uniform thickness across all five panels, while in Neighborhood Flow the green, gold, and blue ribbons vary significantly in their widths in each individual panel as well as across the entire mural as a whole; (2) In Ziller's Flow mural design, the magenta and violet ribbons only intersect the "true" blue and aquamarine ribbons in one panel; whereas, the colored ribbons of Neighborhood Flow have a more dynamic interaction with each other, intersecting numerous times in each panel over the entire length of the Neighborhood Flow mural, and (3) when the four ribbons finally intersect in (only) one panel of Ziller's Flow mural design, the intersections are colored gold, while in Neighborhood Flow the intersections are not a different color; but rather one ribbon is presented as covering the other at the intersection with the dominant ribbon's color blocking the color of the ribbon underneath; thereby creating more of a dimensional/weaved appearance of the ribbons in the Neighborhood Flow mural;

25

(b) the colors used in each respective design are not similar; to wit: (1) Ziller's <u>Flow</u> mural design has a dark indigo background and the <u>Neighborhood Flow</u> mural has a creamy white colored background; and (2) the <u>Flow</u> mural design uses four colored ribbons: magenta, violet, "true blue" and aquamarine; while <u>Neighborhood Flow</u> uses four colored ribbons: pale or "baby" blue; blue, green, and iridescent gold;

(c) the method of continuing the pattern of the colored glass ribbons from one panel of glass to the next in each respective design are not similar; to wit: Ziller's <u>Flow</u> mural design has the ribbons being broken in places (i.e., the violet and magenta ribbons leave one of the panels at the top left hand corner, and only the violet panel reappears at the upper right hand edge of the panel; whereas, the <u>Neighborhood Flow</u> mural does not have such obvious breaks in the continuous flow of each colored ribbon;

(d) the amplitude and frequency of the waves of the ribbons (i.e. the height and or shallowness of each ribbon of color and how often the peaks and valleys repeat) in each design are not similar; to wit: (1) Ziller's <u>Flow</u> mural design uses almost straight lines by comparison to the <u>Neighborhood Flow</u>'s colored ribbons, each of which, and taken as a group, are more undulating; and (2) the ribbons of color do not follow the same pattern of dipping and rising in the <u>Flow</u> mural design as in the <u>Neighborhood Flow</u> design when you look at each individual panel or the two works as a whole, the ribbons of <u>Flow</u> behave very differently from the ribbons in <u>Neighborhood Flow</u>;

(e) the actual number of glass panels used in each respective design is not similar; to wit: Ziller's <u>Flow</u> mural design contemplates five (5) solid panels whereas <u>Neighborhood Flow</u> is made up of 28 individual panes of glass, filling not only the five (5) panels, but also the door and transom on the Murray Avenue façade of the Building and wraps around to the Forbes Avenue façade of the Building;

(f) the kind of glass used (or, in the case of the <u>Flow</u> mural design, proposed to be used; i.e. Spandrel™ glass) in each respective work is not similar; to wit: In the <u>Flow</u> mural design, it appears that Ziller proposed achieving color by use of different colors of Spandrel™ glass; whereas, plain plate glass is used in <u>Neighborhood Flow</u> with the colors and textures of the ribbons being achieved by painting the reverse side of each panel and applying various texture techniques to each of the different colors;

(g) there is no mirror used in <u>Neighborhood Flow</u>; whereas, accordingly to Ziller's specifications for the <u>Flow</u> mural design, each ribbon was to be outlined with a narrow band of mirror;

26

(h) Neighborhood Flow is back lit with neon; whereas Mr. Ziller's Flow mural design makes no provision for back lighting of any kind;

(i) the method of fabrication used (or, in the case of the Flow mural design, proposed to be used) in each respective work (see subparagraph (f) above) are different; and

(j) the shape and style of, and materials used in, the transoms in each respective work are different.

(Zielinski Aff. ¶ 14.)  See also Zielinski Dep. at 79-83, 98-103 & Exs. 2, 27, 28, 29, 31.

Plaintiff acknowledges some of these factual points.  See Ziller Dep. at 63 (his design has an "indigo background" and depicts lines of aquamarine, light blue, magenta, violet and gold, with a slight degree of change where the various lines intersect and the colors meet), 78 (he planned on using stained glass rather than painted glass as in Neighborhood Flow), 145-47 (Flow has a dark blue background, but Neighborhood Flow depicts four lines of green, gold, light blue, and dark blue, has a background of cream and colors that are contained within each line rather than colors that fade into one another), 157-59 (Flow has slight variations in ribbon width but the width of Neighborhood Flow's ribbons varies more considerably), 160-61 (his design included a mirror but Neighborhood Flow does not have one; instead it has neon backlighting which his design did not), 201 (his design contemplated only 5 panels and did not include the door and transom of the Building or wrap around to the Forbes Avenue side) & Exs. 4, 6, 14.[38]  See also Ziller Dep. at 204[39] (his design did not include a white background).

However, Plaintiff denies Defendants' contention that these distinctions are significant. First, he denies that both works depict wavy lines because both he and Zielinski were told that

---

[38]     Docket No. 127 Ex. B.

[39]     Docket No. 123 Ex. A.

this was what the developer wanted, arguing that he came up with idea of wavy lines himself. Defendants contend that McCormick communicated design ideas to Ziller during the meetings they had, but Ziller's testimony is that "[w]ith the blueprint, there is artwork contained on that, which is apparently his design, or in conjunction with Mr. Cozza, *with people in the windows*. That was just their preliminary thing.  That was the only indication he gave of anything at all.  He left that open-ended."  (Ziller Dep. at 22)[40] (emphasis added).  See also Ziller Dep. at 21 & Ex. 2 at RZ 0004[41] (copy of blueprint McCormick gave Ziller on March 7, 2003, with outlines of people drawn in the windows).  Thus, there is no support in the record for the contention that anyone communicated to Ziller that his design should incorporate wavy lines.

Plaintiff also notes that McCormick told Cozza that the installed mural "bore a striking resemblance to the concept of the original mural that we looked at with [Ziller]."  (McCormick Dep. at 20.)  Plaintiff testified that numerous lay persons have told him that they thought the installed mural was his Flow.  (Ziller Dep. at 163, 208-10.)  Finally, he described the similarities between the works as follows:

> There's four ribbons of color that traverse the length of the façade.  There are curving lines that intersect with each other.  At night when the mural is backlit it is dark blue, as my original Flow design.  In general, I think any average person sees the similarities, and I'm often confronted with that, people who believe I did design what is the infringing mural.

(Ziller Dep. at 163.)  Thus, he contends that there are genuine issues of material fact that would permit the fact-finder to conclude that Neighborhood Flow represents an unlawful appropriation of Flow.

---

[40]      Docket No. 123 Ex. A.

[41]      Docket No. 115 Ex. C.

Defendants EAG/Zielinski have further offered the expert testimony of Paul Burke and Peter Boucher to demonstrate that <u>Neighborhood Flow</u> is not "strikingly similar" to Ziller's <u>Flow</u> sketch.  (Docket No. 127 Exs. G, H.)

Plaintiff notes that Burke stated that "[i]n its simplest form, these attributes might leave one with the impression that [the installed mural and <u>Flow</u>] are the same."  (Burke Expert Op. & Report at 5.)  However, that comment was only about the "overlaps and intersections" and Burke went on to contrast the two works on this point as follows:

> They both have these 4 lines undulating, however, the key difference is that in the Ziller proposal, there are two sets of two lines that intersect in the center of panel three (3) with a specific overlap indicated in yellow.  In the Installed Mural, each line follows its own independent path and happens to intersect with other lines with no specific intentional union.  There is, therefore, no marked visual indication of any union of any lines because no meaningful union exists.  The lines in the Installed Mural are random and the lines in the proposed work have purpose.  This, I feel, is a key difference between the two works.

(<u>Id.</u>)

Plaintiff's expert lists six elements that he contends create similar overall visual impressions between the two works: 1) similar size; 2) similar materials; 3) both depict four wavy lines that intersect at various points along the length of the mural; 4) similar "positive" and "negative" allocation of space; 5) similar background color; and 6) similarity between the "predominant" line in each work.  (Shipman Expert Op. & Report at 5-6.)  He concludes that "the Installed Mural is so substantially similar to Mr. Ziller's <u>Flow</u> mural design that the Installed Mural could not have been created independently."  (Shipman Aff. ¶ 5.)

Defendants contend that these similarities are either irrelevant to the issue of copying or are belied by the record.  They argue that the first three elements – similar size and materials and four wavy lines – are the result of Ziller and Zielinski both designing their work to fit the

specifications of the Building and to meet the ideas of the developers of the project.  The record supports the conclusion that the size of the mural would be based on the space to fill, and does not support an inference of copying.  With respect to the issue of similar materials, although both works utilize glass (in windows), Plaintiff admitted that his design proposed the use of different colors of Spandrel™ glass, not the back-painted glass actually used in the Installed Mural.

As noted above, with respect to the issue of the use of wavy lines, Plaintiff denies being given this suggestion by anyone else and argues that it was his own idea.  Defendants have not supported their contention that McCormick conveyed to Ziller that Cozza wanted wavy lines incorporated into the design.  Moreover, Defendants have not even suggested, much less offered any evidence to support the idea, that Cozza or anyone else indicated that the mural should contain four wavy lines.  Rather, Zielinski states that Cozza generally suggested the idea of "flow" to him, although (as Plaintiff correctly observes), Zielinski also testified that he came up with the idea of "flow" himself.

Defendants argue that Shipman's reference to "positive" and "negative" space is unexplained but that:

> from a layperson's perspective, a glance at the positive and negative space of the work reveals that the relationship between the two is not striking enough to infer copying – if the mural was actually copied from Plaintiff's alleged work, there would be near identity on this issue, which is not presented here.

(Docket No. 119 at 16.)  However, they cite no authority for this proposition.

Defendants correctly note that the background of the Installed Mural is white; whereas Plaintiff's proposed mural would have utilized a dark blue background.  Shipman relies on the Installed Mural's appearance at night, which depends upon its neon lighting creating the illusion of a dark background, but Defendants argue that this is a false comparison because Plaintiff's

30

design did not incorporate any backlighting.

Finally, Shipman compares the blue line in each work, which he describes as the "predominant" one.  Shipman states that:

> Finally, and perhaps most striking, is the fact that the geometric pattern of the predominant blue line in the installed mural, line Def-1, is substantially similar to the predominant line in <u>Flow</u>, line Flow-1, such that line Def-1 is almost an exact replica of line Flow-1.  This point is illustrated in Exhibit 27, in which line Flow-1 is positioned above line Def-1, demonstrating that the two lines are so substantially similar that they are essentially parallel to each other.

(Shipman Expert Op. & Report at 12.)  Defendants argue that Shipman offers no explanation for what they contend is an arbitrary comparison between the two works.

As in the <u>Designer's View</u> case, Defendants have pointed to what they assert are significant differences between Plaintiff's work and their alleged infringing copy relating to the manner in which the elements on the mural (in this case, the wavy lines) are displayed.  Plaintiff denies the significance of these distinctions.  However, the <u>Designer's View</u> case was decided following a non-jury trial, not based on motions for summary judgment.  The determination of whether the differences to which Defendants point are significant enough to find that the works are not substantially similar must be left to the trier of fact.

Moreover, the Court cannot resolve the "battle of the experts" on the issue of substantial similarity in the context of deciding motions for summary judgment.  Whether the two works are so substantially similar that one could not have been independently created but must have been copied from the other will have to be determined by the trier of fact.  Therefore, with respect to the issue of copyright infringement, both of the motions for summary judgment filed by the

defendants should be denied.[42]

Liability of Cozza Individually

Cozza argues that he always acted in his capacity as an employee of Alex Enterprises, LLC, the general partner of Alex-Forbes and Murray, L.P.  Plaintiff responds that he always knew Cozza as the president of Alex Development and never heard the term "Alex-Forbes and Murray" until he filed suit.  (Ziller Dep. at 168-69, 171.)  He stated that "I only spoke with Craig Cozza as a representative of what his card said was his business and what his e-mail says is his business."  He further stated that Cozza's e-mail address was craigcozza@alexdevelopment.com and that his business card listed him as president of Alex Development.  (Ziller Dep. at 171.)

Plaintiff argues that, after he filed suit, he learned that Alex Development, the entity he had originally sued, does not exist and that the developer of the Building was Alex-Forbes and Murray, L.P., so he amended his complaint to sue Cozza in his individual capacity and as president of Alex Enterprises, LLC, the general partner of Alex-Forbes and Murray, L.P.  He further argues that there is no record of Alex Development being registered in the Commonwealth of Pennsylvania as either a business entity or a fictitious name.  (Aldous Aff. ¶ 3.)[43]  Cozza testified that he is the managing member of Alex Enterprises, LLC, that he is a limited partner of Alex-Forbes and Murray, L.P., which owns the Building and that the LLC let the contracts for construction, but that he did not know who Alex Development was.  (Cozza

---

[42]     The Court need not address the arguments that Shipman should be disqualified from testifying because of his prior knowledge of Ziller's work or that he oversteps his role by describing the "overall visual impressions" created by the two works.

[43]     Docket No. 130 Ex. D.

Dep. at 5-7.)[44]  Therefore, Plaintiff contends that Cozza was merely using Alex Development as his personal identity and fictitious name since it was not registered.

"It is a basic tent of agency law that an individual acting as an agent for a disclosed principal is not personally liable ... unless the agent specifically agrees to assume liability." Estate of Duran, 691 A.2d 176, 179 (Pa. 1997) (citation omitted).  Cozza argues that he made no expression of an intent to assume individual liability and Plaintiff has not pointed to any evidence demonstrating that he did so.

Plaintiff's evidence suggests that the record is not clear as to which entity Cozza represented: it may have been Alex-Forbes and Murray, L.P., Alex Enterprises, LLC or Alex Development (although this entity does not appear to have a formal existence).  However, he has produced no evidence that Cozza acted individually rather than in a corporate capacity.  Because all of the potentially liable organizational entities are represented in this suit, there is no purpose to be served in maintaining Cozza as a defendant in his individual capacity.  Therefore, AF&M/Cozza's motion for summary judgment should be granted with respect to Cozza individually and denied in all other respects.

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of the plaintiff (Docket No. 112) be denied.  It is further recommended that the motion for summary judgment submitted on behalf of defendants Craig Cozza, Alex-Forbes and Murray, L.P. and Alex Enterprises LLC (Docket No. 117) be granted with respect to Craig Cozza and denied in all other respects.  It is further recommended that the motion for summary judgment submitted on behalf of defendants Emerald Art Glass and Robert Zielinski (Docket No. 124) be

---

[44]      Docket No. 130 Ex. G.

denied.

Within thirteen (13) days of being served with a copy, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

Dated: January 17, 2007